# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY RICHARDSON, Individually and on Behalf of all Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>VANGUARD CHESTER FUNDS, MORTIMER J. BUCKLEY, CHRISTINE M. BUCHANAN, JOHN E. SCHADL, EMERSON U. FULLWOOD, AMY GUTMANN, F. JOSEPH LOUGHREY, MARK LOUGHRIDGE, SCOTT C. MALPASS, DEANNA MULLIGAN, ANDRÉ F. PEROLD, SARAH BLOOM RASKIN, PETER F. VOLANAKIS, and THE VANGUARD GROUP, INC.,<br><br>Defendants. | Case No. 22-2091<br><br>**COMPLAINT – CLASS ACTION**<br><br>Jury Trial Demanded |

## INTRODUCTION

1.     Mutual funds are typically organized as trusts and managed by trustees.[1] The trustees, along with officers and advisors of the mutual funds, are required to manage the funds for the benefit of all its shareholders. Trustees cannot favor larger investors, while disregarding and injuring smaller investors.

2.     Vanguard was founded to offer low-cost mutual fund investments directly to everyday investors. Vanguard states that its "core purpose" is "[t]o take a stand for all investors, to treat them fairly, and to give them the best chance for investment success."[2] Throughout its history, Vanguard often lived up to that purpose, becoming one of the most respected and successful investment companies in the world. Vanguard, however, has harmed a group of smaller investors, (the very people it was founded to serve) in order to cater to the retirement plans that drive its bottom line.

3.     Vanguard offers "set-it-and-forget-it" target date retirement funds. These funds are organized as trusts and managed by the same trustees. The investment strategy is based on a target retirement year, such as 2025 or 2050.

4.     Vanguard offers two categories of target date funds: (1) funds for individuals and retirement plans with under $100 million ("Retail Funds"); and (2) funds for retirement plans with over $100 million ("Institutional Funds").

5.     Although the strategy and investments of the Retail and Institutional Funds are the

---

[1] A mutual fund buys assets, such as stocks and bonds, for the benefit of its shareholders. Investors buy shares of the fund, which are valued based on the fund's assets.

[2] Vanguard, "Facts and Figures," https://corporate.vanguard.com/content/corporatesite/us/en/corp/who-we-are/sets-us-apart/facts-and-figures.html. ("Vanguard Facts and Figures").

same, the Institutional Funds are charged lower management fees.

6.      When target date funds sell assets, federal tax law requires that they distribute any capital gains to shareholders. Investors who hold target date funds in tax advantaged accounts do not incur any tax liability so long as they elect to reinvest these distributions. Vanguard's larger investors, such retirement plans, fall into this category.

7.      Vanguard also markets and sells its target date funds directly to smaller, ordinary investors who hold these funds in taxable and tax advantaged accounts. These investors must pay taxes on these distributions, even when the distributions are automatically reinvested in taxable accounts, which is commonly done. For these investors, if there is a significant sell-off of assets in their target date fund, this results in significant tax bills.

8.      Furthermore, as set forth more fully below, smaller, ordinary investors like the Plaintiff who hold target date funds in tax advantaged accounts like individual retirement accounts nevertheless *also* incur tax liability when they elect ***not*** to reinvest distributions.

9.      Typically, capital gains distributions are minimal because target date funds do not sell many assets. Beginning in December of 2020, however, Vanguard itself caused a massive sell off from its Retail Funds. Vanguard decided to allow access to its Institutional Funds to all retirement plans with at least $5 million. Now, retirement plans that were invested in the Retail Funds could sell their shares and transfer over to cheaper, but otherwise the same as they hold the same assets as Institutional Funds. Unsurprisingly, this is what occurred.

10.     In order to raise cash needed to redeem so many shares, the Retail Funds were forced to sell off a large percentages of their assets. When these assets were sold, the Retail Funds recognized capital gains on the assets. The resulting capital gains distributions to investors were unprecedented: 40 times previous levels. While retirement plans in non-taxable accounts where

capital gains were reinvested were not affected, investors with taxable accounts and those with individual retirement accounts whereby investors did not elect to reinvest capital gains were hit with large tax liabilities.

11.    Investors were stunned, and many took to message boards on the Internet devoted strictly to discussing "Investing advice inspired by John Bogle" called Bogleheads, which is "the title adopted by many of the investing enthusiasts who participate in this site [and the] term is intended to honor Vanguard founder and investor advocate John Bogle."[3]

12.    Vanguard had other options at its disposal to provide cheaper options for retirement plans without harming investors with taxable accounts. Rather, in gross violation of its fiduciary duties and other legal duties, Vanguard did not consider other options which would have avoided harming smaller, taxable investors.

## THE PARTIES

### Plaintiff

13.    Mary R. Richardson ("Richardson" or "Plaintiff") is domiciled in South Carolina. She invested in Vanguard's 2025 (VTTVX) Retail Fund in an IRA and opted to have any capital gains *not* reinvested in the account.

14.    The proposed class includes all investors who purchased the Retail Funds in taxable accounts as well as those investors who purchased the Retail Funds in tax advantaged accounts and opted to have any capital gains *not* reinvested in the account.

### The Trust and Trustee/Officer Defendants

15.    Vanguard's target date funds are organized as Vanguard Chester Funds, a Delaware statutory trust ("the Trust"). Its shareholders are domiciled throughout the nation.

---

[3] https://www.bogleheads.org/forum/viewtopic.php?f=10&t=372847&newpost=6678772

16.    The Trust and each of its funds, including the Institutional and Retail Funds, were managed, at the relevant times, by the same group of trustees and officers (the "Trustee and Officer Defendants"). The Trustee and Officer Defendants and their domicile are identified below:

| Defendant | Role | Domicile |
|---|---|---|
| Mortimer J. Buckley | Chief Executive Officer ("CEO"), Chairman of the Board, and President of the Trust. Trustee | Pennsylvania |
| Christine M. Buchanan | Chief Financial Officer ("CFO") | Pennsylvania |
| John E. Schadl | Chief Compliance Officer ("CCO") | Pennsylvania |
| Emerson U. Fullwood | Trustee | New York |
| Amy Gutmann | Trustee | Pennsylvania or New York |
| F. Joseph Loughrey | Trustee | Indiana |
| Mark Loughridge | Lead Independent Trustee | Connecticut |
| Scott C. Malpass | Trustee | Indiana or Florida. |
| Deanna Mulligan | Trustee | New York |
| André F. Perold | Trustee | Massachusetts |
| Sarah Bloom Raskin | Trustee | Washington, DC or Maryland |
| Peter F. Volanakis | Trustee | New Hampshire |

17.    The "Trustee Defendants" means Defendants Mortimer J. Buckley, Emerson U. Fullwood, Amy Gutmann, F. Joseph Loughrey, Mark Loughridge, Scott C. Malpass, Deanna Mulligan, André F. Perold, Sarah Bloom Raskin, and Peter F. Volanakis.

18.    The "Officer Defendants" means Mortimer J. Buckley, Christine M. Buchanan, and John E. Schadl.

***Defendant Vanguard Group***

19.    The Vanguard Group, Inc. ("Vanguard Group") is incorporated in Pennsylvania

with its headquarters located at 100 Vanguard Boulevard, Malvern, Pennsylvania, 19355.
Vanguard Group provides "virtually all" of the "corporate management, administrative, and
distribution services" for the Trust. It also provides investment advisory services to the target date
funds.[4]

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The
amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs,
and the matter is a class action in which one or more members of the proposed class is a citizen
of a State different from any Defendant.

21.    The Court has personal jurisdiction over the Trust, and each Trustee and Officer
Defendant, because the claims arose from, or relate to, Trust management decisions that were made
and/or carried out by the Trustee and Officer Defendants (or their agents) at Vanguard's
Pennsylvania headquarters. For instance, Trustee meetings occurred there, the Trustees and
Officers worked with Vanguard Group to execute fund management decisions there, the Trustee
and Officer Defendants entered into relevant contractual relationships centered there (including
service contracts with Vanguard Group), and the mailing address of the Trustees, for Trust
business, is P.O. Box 876, Valley Forge, Pennsylvania 19482. By conducting fund business in
Pennsylvania, each Defendant purposefully availed itself of the privilege of doing business in the
state. In addition, certain Trustee and Officer Defendants are domiciled in Pennsylvania.

22.    The Court has personal jurisdiction over Vanguard Group because its principal

---

[4] Vanguard Chester Funds, "Statement of Additional Information January 31, 2022" at B-35,
https://advisors.vanguard.com/pub/Pdf/sai059.pdf ("Vanguard Chester Funds' Statement of
Additional Information").

place of business is in Pennsylvania.

23.     For the Trust and Trustee/Officer Defendants, venue is proper under 28 U.S.C. § 1391 because a substantial part of Defendants' conduct giving rise to the claims occurred in this District, at Vanguard's headquarters. Also, certain Trustee and Officer Defendants reside in this District.

24.     For Vanguard Group, venue is proper because it resides in this District.

## SUBSTANTIVE ALLEGATIONS

*Vanguard's Target Date Funds*

25.     Vanguard's target date funds invest money across asset classes based on a specific or target retirement year, such as 2025, 2035, or 2050. The target date funds buy and hold other Vanguard funds such as Vanguard stock and bond index funds. As the target date approaches, the target date funds become more conservatively invested, with more bonds and fewer stocks. As a result, as investors get closer to retirement and likely closer to needing the money, their portfolio becomes more conservative and less volatile.

26.     Vanguard markets its target date funds to consumers who do not want to manage their portfolio actively. John Bogle, Vanguard's founder, describes Vanguard's mutual funds' central philosophy as "set it and forget it."[5] Financial advisors recommend target date funds as a "set-it-and-forget-it option" where investors can "literally invest their entire portfolio."[6] As Vanguard promotes, the funds are "an all-in-one solution for those without the time, willingness,

---

[5] Chron.com, "Vanguard founder's advice: Set it and forget it," https://www.chron.com/business/article/Vanguard-founder-s-advice-Set-it-and-forget-it-1780677.php

[6] Morningstar.com, "A Set-It-and-Forget-It Target-Date Series from Vanguard," https://www.morningstar.com/articles/929967/a-set-it-and-for get-it-target-date-series-from-vanguard

or ability to build and manage their own portfolio."[7]

27.     Vanguard has two tiers of target date funds the: (1) Retail Funds for individuals and retirement plans with under $100 million; and (2) Institutional Funds for retirement plans with over $100 million. These two tiers have the same strategy, managers, and investments in the same underlying Vanguard funds, but the Institutional Funds charge lower management fees than the Retail Funds charge. Other than different management fees and the investment minimums, the Retail and Institutional Funds are the same.

***Capital Gains Distributions From Selling of Assets Harm Taxable Investors***

28.     When a target date fund sells assets and receives cash, federal tax law requires the fund to distribute the capital gains it realizes to its shareholders. *See* 26 U.S.C. § 852(a)(1). These distributions are *pro rata*. If investors hold the target date fund in a tax-advantaged account, such as a 401(k), these investors can simply re-invest the cash without paying any taxes.

29.     But if the funds are held in taxable accounts, or held in tax advantaged funds whereby the investor has opted to have any capital gains ***not*** reinvested in the account however, any distributions will be subject to substantial federal and state taxes. For many investors, they may be taxed over 20% for these gains. Even if the investor does not receive any cash and the distribution is immediately reinvested in the fund, which is commonly done, they still have to pay taxes.  Substantial capital gains distributions mean substantial capital gains tax bills.

30.     This is precisely what happened to the Plaintiff here.  Specifically, Plaintiff Richardson purchased $200,000 worth of VTTVX (Vanguard Target Retirement 2025 investment

---

[7] Vanguard, "Vanguard Broadens Access to Low-Cost Institutional Target-Date Funds," https://pressroom.vanguard.com/news/Press-Release-Vanguard-Broadens-%20Access%20-to-Low-Cost-Institutional-Target-Date-Funds-12-11-2.html ("December 2020 Press Release").

option) on August 4, 2021 in her traditional IRA account. But because Plaintiff elected to have and capital gains **not** reinvested in the account, Plaintiff realized significant capital gains at the end of 2021, causing significant tax consequences.

31.     Target date funds rarely sell many assets, and thus capital gains distributions, along with taxes are small. Mutual funds typically keep cash on hand to pay for typical redemptions, so typical redemptions do not require selling substantial assets. Small capital gains distributions from stock dividends and potentially from the slow re-balancing of the portfolio to include more bonds are not surprising each year. These distributions are usually a fraction of a percent of the overall value of the fund. Accordingly, investors can reasonably expect capital gains distributions from their funds to be insignificant.

32.     Most shares of Vanguard's target date funds are held in tax-advantaged accounts, such as retirement plans that are exempt from paying tax on capital gains when reinvested. According to Vanguard, "four out of five participants in 401(k) plans [kept] at Vanguard are now invested in a target-date fund."[8] Plans with less than $100 million invested in the Retail Funds, and the larger plans with over $100 million, invested in the cheaper Institutional Funds.

33.     Vanguard also markets and sells its Retail Funds directly to consumers. Accordingly, there is a small group of investors who are everyday consumers who hold shares of Vanguard's target date funds in their taxable accounts and in traditional tax advantaged IRA accounts with the election to have capital gains **not** reinvested in the account. According to FINRA, about a third of U.S. households have investments in taxable accounts:

---

[8] December 2020 Press Release, *see* footnote 7.



*FINRA, A Snapshot of Investor Households in America* [9]

34.    Investors who purchase target date funds in taxable accounts do not have the ability to sell their shares or purchase alternative investments without realizing capital gains and thus, taxes on the capital gains. These investors who join the Retail Fund remain in the funds for the long term and are beholden to the decisions of Vanguard's management.

***In Order to Cater to Retirement Plans, Vanguard Prompts Massive Sell-Offs***

35.    In December of 2020, to attract and serve retirement plans, Vanguard intentionally caused an unprecedented sell-off from its Retail Funds.

**<u>Vanguard's Decision</u>**

36.    Vanguard is one of the largest investment companies worldwide, managing assets

---

[9] FINRA, "A Snapshot of Investor Households in America," https://www.sec.gov/spotlight/fixed-income-advisory-committee/finra-investor-education-foundation-investor-households-fimsa-040918.pdf

of over $8 trillion.[10] To be competitive, Vanguard seeks to obtain the most assets under management, while maintaining low fees. It is "the largest mutual fund provider" and is engaged in an ongoing "price war" with its competitors.[11] And "Vanguard is the largest target-date fund manager in the industry and the number one recipient of cash flowing into target-date funds."[12]

37.     Since the majority of the money in Vanguard's target date funds is from company and institutional retirement plans, Vanguard is motivated to keep the managers of its retirement plans happy.

38.     Prior to December 2020, only retirement plans with at least $100 million could participate in the Institutional Funds. Retirement plans below $100 million were limited to the Retail Funds. The Retail Funds are subject to higher fees than the Institutional Funds. Retirement plans smaller than $100 million wanted the lower fees that were available to the Institutional Fund investors.

39.     In or around December 2020, to maintain its competitive advantage against other mutual fund providers, Vanguard decided to lower fees for retirement plans in its Retail Funds for plans with $5 million to $100 million invested.

40.     The problem was that by Vanguard permitting these retirement plans to participate in the Institutional Funds, this would trigger a massive sell-off in the Retail Funds as plans would need to sell their assets to move them over to the Institutional Fund. To obtain cash to redeem these

---

[10] Vanguard Facts and Figures, *see* footnote 2.

[11] AP News, "Fidelity slashes fees as funds battle for investors," https://apnews.com/article/1f2ed0e747f6495faa18db2d55a17ff2

[12] December 2020 Press Release, *see* footnote 7.

shares, the Retail Funds needed to sell a substantial portion of their assets. In doing so, the Retail Funds would realize capital gains on any assets they sold that had appreciated in value. As the law requires, the Retail Funds needed to distribute those capital gains as cash to the investors remaining in the Retail Fund. This would result in an extraordinary capital gains distribution that would impact only smaller investors whose funds were held in taxable accounts as they are required to pay capital gains taxes, while sparing large, institutional investors whose funds were held in tax-advantaged accounts, as they are able to re-invest the cash without tax liability.

41.     Vanguard had several options available to it that would have avoided harming investors in taxable accounts and also investors in IRA accounts who elected to have and capital gains ***not*** reinvested in the account, including:

- Lowering the Retail Fund fees for plans that had at least $5 million invested. This could be achieved by restructuring share classes, reclassifying shares, or other means. Fee-tiering is routinely done by mutual funds, including other Vanguard funds. Restructuring the fees would  reward retirement plans but would avoid any adverse tax consequences for smaller, taxable investors.

- Merging the Retail and Institutional Funds. Merging similar funds are common in the mutual fund industry. Doing so here could be easily accomplished as the funds had the same strategy, asset mix of other Vanguard funds, and management. Combining the funds would not be complicated and would avoid tax consequences for any shareholders. Vanguard could then adjust or tier the fees in the merged fund.

42.     However, rather than selecting one of these easily-achievable options, Vanguard decided to disregard smaller, taxable investors; drop the Institutional Fund investment minimums

immediately; and spark a massive sell-off.

43.     In December 2020, Vanguard chose the "massive sell-off" option, stating:

> Effective immediately, the plan-level minimum investment requirement [for the Institutional Funds] has been reduced to $5 million from $100 million, enabling more 401(k) and 403(b) plan sponsors to offer these low-cost, broadly diversified options to their retirement plan participants.[13]

44.     Vanguard's announcement of reducing the minimum investment requirement for Institutional Funds hyped the benefit to retirement plans, but was silent as to the effect on smaller, taxable investors. Vanguard's press release stated: "'Vanguard works tirelessly to improve outcomes for plans sponsors and their participants.'" *Id.*

### The Resulting Sell-Off

45.     When the minimum investment required for Institutional Funds was lowered, as *The Wall Street Journal* described, it "set off an elephant stampede, as multimillion-dollar corporate retirement plans got out of the standard target funds and into the Institutional equivalents."[14]

46.     Particularly, in the months that followed the December 2020 decision, plans with $5 million to $100 million sold their Retail Fund shares and moved to the Institutional Funds. The Retail Funds were forced to sell assets to raise cash to redeem the shares. *The Wall Street Journal* reported that "assets at Vanguard's 2035 target fund shrank to $38 billion from $46 billion" and

---

[13] December 2020 Press Release, *see* footnote 7. Importantly, the press release was sent from Valley Forge, P.A., Vanguard's headquarters, where crucial decisions are made.

[14] *The Wall Street Journal*, "The Huge Tax Bills That Came Out of Nowhere at Vanguard," https://www.wsj.com/articles/vanguard-target-retirement-tax-bill-surprise-11642781228 ("*WSJ* Article").

the "2040 fund shriveled to $29 billion from $36 billion."[15] This was an unprecedented sell-off of 15%, or more, of the assets of the entire fund.

47.      As the Retail Funds sold assets, they predictably realized capital gains. Vanguard, as required or as elected, distributed the capital gains to investors, *pro rata*. At the end of 2021, Retail Fund investors were hit with capital gains distributions at least 40 times larger than ever before.

48.      The following *Morningstar* chart illustrates the scale of these distributions:



***Investors With Taxable Accounts Were Damaged***

49.      "Set-it-and-forget-it" target date funds are attractive investments because they allow investments to grow in value and compound over many years (until retirement and beyond),

---

[15] *Id.*

without being liquidated, distributed, and taxed. For tax-advantaged retirement plans where investors chose to reinvested capital gains, the large capital gain distributions were harmless. These plans merely reinvested the cash, without taking any tax ramifications.

50.    For smaller, taxable investors or those in tax advantaged plans like the Plaintiff who chose not to reinvest capital gains, however, these capital gain distributions meant massive tax bills (tens of thousands or even hundreds of thousands of dollars). Although if these investors began to withdraw money after the target retirement year (*e.g.*, 2030), they would potentially have to pay capital gains taxes at that point. But by being forced to pay taxes on the capital gains distributions now, these investors lost the ability to earn compounding returns on that money for many years.

51.    This loss of compounding returns is not insignificant. The 100-year average return for the S&P 500 is over 10%.[16] At a conservative, 8% rate of return, money doubles in under 10 years, which is far shorter than, say, the 2040 target date. By being forced to pay taxes now, taxable investors lost the capability to double their money, or even more. The majority of investors set their capital gain distributions to reinvest in the fund immediately and automatically. Accordingly, the tax liability comes without any cash to pay towards this bill which could force these investors to sell assets and potentially incur even more capital gains tax liability.

52.    The claims asserted herein are direct claims, not derivative claims. The injury to taxable investors was independent of any injury to the Trust (*i.e.*, to the funds themselves). The Trust was not injured. Most shareholders were not harmed either as many hold their Retail Funds in tax-advantaged accounts (so long as the investor has opted to have capital gains reinvested in

---

[16] Investopedia, "What Is the Average Annual Return for the S&P 500?"
https://www.investopedia.com/ask/answers/042415/what-average-annual-return-sp-500.asp

the account).

53.    Indeed, the largest non-taxable investors benefitted since they received access to the Institutional Funds. As *The Wall Street Journal* summarized, Vanguard caused a "change that benefited big clients [and] left little ones holding the bag."[17] Accordingly, it would be unjust for the Trust itself to receive the benefit of any recovery. Rather, the recovery must go directly to taxable investors that were damaged.

### After Harming Investors, Vanguard Merges the Retail and Institutional Funds

54.    In September 2021, just a few weeks after Plaintiff purchased the Retail Funds, Vanguard changed course and decided it would merge the Retail and Institutional Funds. This decision occurred only a few months after Vanguard triggered the massive sell-off.

55.    This was straightforward, as the "merged funds will retain the same investment strategy, asset allocations, and glide path [change in asset allocation as the target date approaches]."[18] Importantly, the merger did not have any tax consequences for any investors. In fact, Vanguard received a tax opinion confirming that there would be no tax consequences.[19]

56.    This was too little too late because the damaged was done. Taxable investors already incurred unnecessary capital gains distributions and associated tax liabilities. The harm Vanguard caused could not be undone.

57.    The decision to combine the Retail and Institutional Funds, which occurred in

---

[17] *WSJ* Article, *see* footnote 14.

[18] Vanguard, "Vanguard to Lower Investor Costs by an Estimated $190 Million through Enhancements to its Target Retirement Series," https://pressroom.vanguard.com/news/Press-Release-Vanguard-to-Lower-Investor-Costs-by-an-Estimated-190M-Through-Enhancements-to-TRFs-092821.html ("September 2021 Press Release").

[19] Dechert Tax Opinion, https://www.sec.gov/Archives/edgar/data/0000752177/000113743922000131/taxopinion.htm

September 2021, could have been made in December 2020. If Defendants merged the funds in December 2020, the smaller, taxable investors would not have been harmed by incurring the larger capital gain distributions which were levied with a large tax bill as there would not have been a massive sell-off in the Retail Funds.

***Defendants' Responsibility***

58.    Vanguard states that its legal duties to shareholders are central to its mission:

> Core to our mission to give investors the best chance for investment success is our fiduciary duty to maximize long-term investment returns for our funds' shareholders.[20]

59.    Each Defendant had this and other legal duties. The decision to reduce the Institutional Fund investment minimums rather undertaking other actions which would result in lowered fees for retirement plans without triggering a massive sell-off in Retail Funds violated this duty. Defendants intentionally triggered asset sell-offs, resulting in large capital gains distributions which resulted in taxable shareholders sustaining tax liabilities that could have been deferred for many years, or even eliminated altogether. Rather than maximize long-term investment returns for its customers, Vanguard did the opposite.

60.    Each Defendant was responsible for this decision. Each Defendant is jointly responsible, or in the alternative, each Defendant is individually responsible.

**The Trust and Trustee Defendants**

61.    The Trustee Defendants are responsible for the Trust's governance including the target date funds. The Trustees are required to coordinate the funds as well as manage each fund,

---

[20] Vanguard, "Our approach to ESG investing: Engage, allocate, and avoid," https://corporate.vanguard.com/content/corporatesite/us/en/corp/articles/our-approach-to-esg-investing.html

in the interest of all of its shareholders. According to Vanguard, the "trustees believe that their primary responsibility is oversight of the management of each fund for the benefit of its shareholders, not day-to-day management."[21] The Trustees have to manage the funds for the benefit of all "its shareholders" – whether those holding in taxable or non-taxable accounts, and cannot favor those holding in retirement plans.

62.    The Trustees "set broad policies for the funds" including to "monitor fund operations," and to monitor "regulatory compliance."[22] These Trustees are responsible for all Retail and Institutional funds in the Chester Trust and coordinate their management. Accordingly, the Trustees were ultimately responsible for the sell-off decision that hurt taxable investors.

**Officer Defendants**

63.    The Officer Defendants are also responsible for the harm done to taxable investors. The sell-off decision required the Officer Defendants' involvement, advice, and approval from the Trust's CEO, CFO and CCO. The CEO would, for example, evaluate the overall strategy; the CFO would evaluate the financial and tax consequences; and the CCO would evaluate the legality. As with the Trustees Defendants, the Officers Defendants have legal duties to manage the funds for the benefit of all shareholders.

64.    When Vanguard decided to merge the funds, the announcement included a quote from CEO Buckley, stating in part:

> "Vanguard will continue to innovate for clients, and our unique client - owned structure allows us to share our success with clients through lower fees."[23]

---

[21] Vanguard Chester Funds' Statement of Additional Information, *see* footnote 3.

[22] *Id.*

[23] September 2021 Press Release, *see* footnote 18.

65.     But Buckley, and Vanguard, were really only discussing their success with larger retirement plans. To achieve this success, they harmed ordinary, taxable investors.

## Vanguard Group

66.     Vanguard Group "manages the day-to-day operations of the funds under the direction of the board of trustees."[24] Vanguard Group also serves as the investment advisor to the target date funds. In its role, Vanguard Group also has a legal duty to manage the funds for the benefit of all shareholders. Vanguard Group is liable as it would have been involved in the sell-off decision, would have advised on it, and consented to it.

## Defendants Were Grossly Negligent, Reckless, or Acted in Bad Faith

67.     Defendants had complete control over when, and how, Vanguard chose to lower fees for its retirement plans. The Trustee and Officer Defendants controlled the structure of both the Retail and Institutional Funds. Vanguard even controlled the underlying investments which they themselves were Vanguard funds. The decision to lower the minimum investment in the Institutional Funds was not one that the Defendants had to make in a particular time period. There was no pressing deadline for this change. Accordingly, Defendants had the opportunity they needed to be diligent and prudent with making changes to the target date funds.

68.     The changes in the fees for retirement plants and minimum investments for the Institutional Funds was made specifically to favor one class of investors to the detriment of other investors. Defendants' decisions benefited the retirement funds that are the bulk of Vanguard's business and help their bottom line. This was a red flag that demanded careful attention to conflicts between investors.

---

[24] Vanguard Chester Funds' Statement of Additional Information, *see* footnote 4.

69.     There are only two possible explanations for what occurred, but each involves a fundamentally broken decision-making process and a grossly negligent, reckless, or bad faith breach of fiduciary duty by each Defendant.

70.     The first explanation is that Defendants disregarded their legal duties to taxable investors and failed to even consider the harm that would result by their decision. This would mean that Defendants took action without:

        (a)     informing themselves of, and considering, the capital gains distributions;

        (b)     informing themselves of, and considering, the tax consequences for taxable investors; and

        (c)     identifying, exploring, and duly weighing alternative paths that would avoid this harm.

71.     Under this possibility, each Defendant grossly and recklessly breached their fiduciary duties by failing to inform themselves of this information and taking necessary steps to protect all investors, including smaller, taxable investors (including those in traditional IRA accounts who chose not to reinvest capital gains) in the Retail Funds.

72.     The second possibility is that Defendants did recognize that their decision would harm taxable investors, but ignored this harm because Vanguard places more value on the retirement plans than it does for retail investors. This was, at a minimum, a reckless breach of Defendants' duties to ordinary investors. The harm that would result to taxable investors was not a risk, it was a guarantee. Any disregard of that harm was bad faith. Each Defendant consciously put the financial interests of large retirement plans above the interests of smaller, taxable investors.

73.     Regardless of the explanation, Defendants had all the information they needed readily at their disposal. In fact, it was known to Defendants but consciously disregarded.

22

74.    When Defendants decided to permit retirement plans with over $5 million to join the Institutional Funds, the mass sell-off was not just conceivable, it was intended. Defendants wanted larger retirement plans to sell their Retail Fund shares and use the proceeds to buy Institutional Fund shares. This was the entire purpose of reducing the Institutional Fund minimums. This was not an unforeseen sell-off caused by an external event such as a market shock. Defendants intentionally caused the sell-off in order to accommodate retirement plans.

75.    Each Defendant knows that many retail investors hold target date funds in taxable accounts or in tax advantaged accounts but nevertheless chose not to reinvest capital gains in those accounts. Under Defendants' direction Vanguard:

- Markets and sells its Retail Funds directly to consumers, including consumers that use taxable accounts and those who use traditional retirement accounts but nevertheless chose not to reinvest capital gains in the account;

-  Tracks what Vanguard accounts (taxable or non-taxable) are used to buy target date funds; and

- Specifically recognizes, in fund prospectuses, that investors will use taxable accounts to hold target date funds.[25]

76.    Furthermore, each Defendant knows that tax laws require target date funds to distribute any capital gains it realizes to its investors as cash. Defendants also know that those distributions will result in capital gains taxes for investors who hold the funds in their taxable accounts. Vanguard's prospectuses recognize that, unlike its tax-advantaged investors, its taxable investors are vulnerable to capital gains distributions:

The Fund's distributions may be taxable as ordinary income or capital

---

[25] Vanguard, "Vanguard Target Retirement 2040 Fund Summary Prospectus" at 9, https://personal.vanguard.com/pub/Pdf/sp696.pdf?2210177848 (discussing taxable investors).

gain. If you are investing through a tax-advantaged account, such as an IRA or an employer-sponsored retirement or savings plan, special tax rules apply.[26]

Defendants were thus aware that, unlike Vanguard's tax-advantaged investors, its taxable investors are vulnerable to capital gains distributions.

77.    Thus, the harm to taxable investors from the sell-off was not an unknown, hidden risk that would require care for Defendants to discover. Rather, the harm was foreseeable, obvious, and known to Defendants. It was simply a matter of looking at how many plans had more than $5 million invested, calculating the likely outflow, remembering that taxable investors exist, and considering the tax consequences for them.

78.    Furthermore, Defendants had alternative, readily-available paths to accomplish their desired result without harming taxable investors. Defendants could have lowered fees in the Retail Funds for plans with over $5 million. Alternatively, Defendants could have chosen to merge the Retail and Institutional Funds as they eventually did.

79.    Worse, after the sell-off decision was made, Defendants did nothing for nine months. Rather they watched the sell-off occur which damaged its customers without taking any remedial action. In the months following December 2020, retirement plans in the Retail Funds redeemed their shares, requiring the funds to sell assets and realize capital gains. Defendants did nothing to stop or reverse the process; they just watched it unfold. It took Defendants several months later, after the damage was done, to decide to merge the Retail and Institutional Funds.

***Defendants Harmed Plaintiff and the Class***

80.    Plaintiff held Retail Fund shares in a tax advantaged account but elected to have

---

[26] *Id.*

capital gains not reinvested in the account during the relevant timeframe.

81.     Specifically, Plaintiff Richardson invested in Vanguard's 2025 Retail Fund.  She held this investment in a tax advantaged IRA Brokerage Account but elected to have the capital gains not reinvested in the account.  In 2021, this fund distributed to her over $24,000 in capital gains. Richardson incurred a tax liability in connection with the capital gains distribution from the investment in Vanguard's Retail Funds.

82.     Plaintiff seeks fair compensation for the harm done to them and other taxable Retail Fund investors. Across all taxable investors, that harm is hundreds of millions of dollars or more.

83.     Plaintiff also seeks an injunction forbidding Vanguard from taking actions that trigger additional sell-offs or that further harm taxable investors in its target date funds. Despite being harmed by Vanguard, Plaintiff and class members whose shares have appreciated in value are trapped in their Retail Funds. They cannot sell the funds without incurring additional capital gains tax liability. Plaintiff and Class members are thus vulnerable to future Vanguard decisions that trigger more sell-offs, or that otherwise injure taxable investors in the Retail Funds. This risk is concrete and imminent, because Vanguard has already shown a disregard for its taxable investors.

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings claims on behalf of the class of: all U.S. investors in Vanguard's Retail Funds who held these funds in taxable accounts or in tax advantaged accounts and who and opted to have any capital gains *not* reinvested in the account and who received 2021 capital gains distributions (the "Class").

85.     The following people are excluded from the class and the subclasses: (1) any

Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parent entities have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel, and their experts and consultants; and (6) the legal representatives, successors, and assignees of any such excluded persons.

***Numerosity***

86.    The proposed Class is so numerous that joinder is impractical. Plaintiff believes that there are at least thousands, if not tens of thousands, of class members.

***Commonality***

87.    There are questions of law and fact common to the proposed Class. Common questions of law and fact include, without limitation:

- Whether Defendants violated their fiduciary duties;

- Whether Defendants' violations harmed Class members;

- Whether Defendants violated applicable consumer protection laws; and

- What damages are needed to compensate Class members reasonably.

***Typicality***

88.    Plaintiff's claims are typical. Like the Class, Plaintiff invested in Vanguard's Retail Funds that incurred 2021 capital gains distributions and accompanying tax liability.

***Predominance and Superiority***

89.    Prosecuting separate actions would risk inconsistent outcomes and inconsistent standards for Defendants. For example, this would risk inconsistent findings on whether

Defendants breached their fiduciary duties to similarly-situated taxable investors.

90.     Common questions of law and fact predominate over any individual questions. For example, core liability questions are common: whether Defendants breached their fiduciary duties (among other legal duties) and whether this harmed class members.

91.     A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to litigate tens of thousands (or more) individual claims in separate lawsuits, every one of which presents the issues present here.

*Ascertainability*

92.     The identity of Class members can be obtained from Vanguard's investment records.

### FIRST CLAIM: Breach of Fiduciary Duty
### Against all Defendants

93.     Plaintiff incorporates the facts alleged above.

94.     Plaintiff brings this claim individually and behalf of the Class.

95.     As Trustees and Officers of the Chester Funds, the Trustee and Officer Defendants owed fiduciary duties to Plaintiff and class members, including the duties of care, loyalty, and good faith.

96.     As the investment advisor and manager of the Chester Funds, Vanguard Group owed similar fiduciary duties to Plaintiff and class members.

97.     As explained in detail above, each Defendant breached their fiduciary duties in connection with the December 2020 sell-off decision. This breach was grossly negligent, reckless, or made in bad faith. As alleged more fully above and summarized here, Defendants:

- Grossly and recklessly breached their duty of care by disregarding their duty to

27

taxable investors, failing to consider how the decision would harm these investors, and failing to consider other options that would achieve the same goals without this harm; or

- Acted recklessly, and in bad faith, by recognizing, and consciously disregarding, the harm to taxable investors, because Defendants placed the interests of larger, institutional investors (which drive Vanguard's bottom line) over the interests of smaller, ordinary investors.

98.    In addition, or in the alternative, Vanguard Group aided and abetted the Trustee and Officer Defendants in breaching their fiduciary duties. As the manager and investment advisor to the Trust, Vanguard Group knew that the Trustee and Officer Defendants were breaching their fiduciary duties, in the way alleged in detail above, and provided substantial assistance in carrying out this breach.

99.    These breaches were a direct and proximate cause of harm and damage to Plaintiff and Class members.

100.    As described in detail above, Defendants acted with conscious disregard and reckless indifference to the rights of Plaintiff and Class members.

### SECOND CLAIM: Gross Negligence
**Against all Defendants**

101.    Plaintiff incorporates the facts alleged above.

102.    Plaintiff brings this claim individually and on behalf of the Class.

103.    As Trustees and Officers of the Chester Funds, the Trustee and Officer Defendants owed a duty of care to Plaintiff and Class members.

104.    As the investment advisor and manager of the Chester Funds, Vanguard Group also owed a duty of care to Plaintiff and Class members.

28

105.     As explained in detail above, in connection with the 2020 sell-off decision, each Defendant grossly deviated from the standard of care. Each Defendant was indifferent to their duty to taxable shareholders and intentionally failed to perform this duty, with awareness and reckless disregard of an extreme risk of harm to Plaintiff and Class members.

106.     Defendants' gross negligence was a direct and proximate cause of harm and damage to Plaintiff and Class members.

### THIRD CLAIM: Breach of the Covenant of Good Faith and Fair Dealing
### Against the Trust and Trustee and Officer Defendants

107.     Plaintiff incorporates the facts alleged above.

108.     Plaintiff brings this claim individually and on behalf of the Class. A contract was formed between (a) Plaintiff and Class members, and (b) the Trust and Trustee and Officer Defendants, that included the Chester Funds Declaration of Trust.[27] That agreement states that it was "entered into … by the Trustees" and that "[e]very Shareholder by virtue of having become a Shareholder shall be held to have expressly assented and agreed to the terms."

109.     The contract provided the Trust and Trustee and Officer Defendants with discretion to make fund management decisions, including merging funds, altering investment minimums, and adjusting fees. This discretion included an implied duty of good faith and fair dealing.

110.     As alleged in detail above, these Defendants failed to exercise their discretion in good faith, in connection with the December 2020 sell-off decision. Each Defendant acted unreasonably and frustrated the benefits of the bargain that Plaintiff and Class members reasonably expected.

---

[27] Chester Funds Declaration of Trust, https://www.sec.gov/Archives/edgar/data/752177/000093247112001166/declarationoftrust_chesterfu.htm

111.    Defendants' breach was a direct and proximate cause of harm and damage to Plaintiff and Class members.

## PRAYER FOR RELIEF

112.    Plaintiff seeks the following relief for themselves and for the Class:

- An order certifying the asserted claims, or issues raised, as a class action;

- A judgment in favor of Plaintiff and the proposed Class;

- Damages, including statutory, enhanced, or punitive damages where applicable;

- An injunction prohibiting Defendants from further harming class members;

- Restitution;

- Disgorgement, and other just equitable relief;

- Pre- and post-judgment interest;

- Reasonable attorneys' fees and costs, as allowed by law; and

- Any additional relief that the Court deems reasonable and just.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.

Dated: May 27, 2022

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

    _/s/ Mark C. Rifkin_
MARK C. RIFKIN
MATTHEW M. GUINEY
270 Madison Avenue
New York, NY 10016
Telephone:  212/545-4600
Facsimile:  212/545-4653
rifkin@whafh.com
guiney@whafh.com

30

*Counsel for Plaintiff and the Class*